IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **United States of America,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.  CR-23-210-RAW |
| ) | |
| **Jeremy Robert Harris,** ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S MOTION TO DISMISS INDICTMENT
ON SECOND AMENDMENT GROUNDS AND BRIEF IN SUPPORT**

Defendant Harris, through counsel, moves this Court to dismiss the Indictment for failure to state an offense pursuant to Fed. R. Crim. P. Rule 12(b)(3)(B)(v). The Indictment against Mr. Harris violates the Second Amendment, and it should be dismissed. In Count One, it alleges that he possessed an unregistered silencer in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d) and 5871. In Count Two, it alleges that his possession of a firearm and ammunition was a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) because of his status as "having previously been convicted of a crime punishable by imprisonment for a term exceeding one year." (Doc. No. 2). An indictment fails to state an offense if the charged offense is based on an unconstitutional statute. *United States v. Stone,* 394 F.Supp.3d 1 (D.C. 2019). After *New York State Rifle & Pistol Ass. v. Bruen,* 142 S.Ct. 2111 (2022), the government must prove that laws regulating conduct covered by the Second Amendment align with this Nation's historical tradition.

Mr. Harris is aware that in *Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023), the Tenth Circuit interpreted *Bruen* to not invalidate laws prohibiting felons from possessing firearms.  Mr. Harris concedes that this Court is bound by this precedent.  However, the law regarding the Second Amendment is developing, and the Supreme Court may provide guidance regarding the validity of criminal laws regarding firearms in the pending *United States v. Rahami* case that calls into question

1

the correctness of the *Vincent* decision. Mr. Harris files this motion to contest the *Vincent* decision's analysis and for record preservation purposes.

**Statement of Facts**

On September 25, 2023, a Kiowa police officer stopped a van driven by Jeremy Harris to investigate alleged traffic violations. After the officer placed Mr. Harris under arrest, she searched the vehicle. The officer discovered several firearms, various calibers of ammunition, and what she described as a silencer affixed to one of the weapons. The officer found these weapons in the back part of the van somewhere behind the driver's seat. At some point during the search, dispatch informed the officer that Mr. Harris had at least one felony conviction out of Illinois. Mr. Harris was subsequently arrested and charged for a violation of Oklahoma's law prohibiting felons from possessing firearms.

Mr. Harris received felony conviction(s) out of the state of Illinois. The convictions resulted from two separate cases charged in 2001 and 2002. He was convicted of unlawfully using a credit card and forgery. Mr. Harris has never been convicted of any violent crimes, and the only felony convictions he has stemmed from conduct that occurred before he reached the age of 20 years old. After receiving his convictions, Mr. Harris joined the United States Army. Mr. Harris served combat. Since receiving the convictions as a young man, he has generally been a law-abiding citizen and has not received any additional convictions.

On December 12, 2023, the government filed an indictment alleging that Mr. Harris committed two separate violations of federal law. The indictment encompasses the same conduct as his current state charge. In Count One, it alleges that he possessed an unregistered silencer in violation of 26 U.S.C. §§ 5841, 5845(a), 5861(d) and 5871. In Count Two, it alleges that his possession of a firearm and ammunition was a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) because of his status

as "having previously been convicted of a crime punishable by imprisonment for a term exceeding one year." (Doc. No. 2).

## Legal Argument

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. AMEND. II. While the Constitution does not define "the people" or "right of the people," the phrase appears elsewhere in the Constitution. *See* U.S. CONST. AMEND. I; U.S. CONST. AMEND IV; and U.S. CONST. AMEND. IX. In *District of Columbia v. Heller,* 128 S.Ct. 2783, 2791 (2008), the Supreme Court determined that in these contexts, "the people" "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." Mr. Harris as an American and has the requisite connection to be a member of the national community. After *Heller*, it is clear the Second Amendment's right to bear arms presumptively applies to him. *See also New York State Rifle & Pistol Association v. Bruen,* 142 S.Ct. 2111, 2126 (2022).

In *Bruen,* Justice Thomas concluded that the previously used two-step approach was "one step too many." 142 S.Ct. at 2117. In finding that a New York firearm restriction violated the Second Amendment, the Supreme Court shifted the burden to the government, who "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. The Court continued:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

3

The test "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131. The Tenth Circuit Court of Appeals recently summarized the new test to require consideration of two questions:

> 1. Does the Second Amendment's plain text cover an individual's conduct?
> 2. If the answer is *yes*, has the government justified the ban by showing that it's consistent with the nation's "historical tradition of firearm regulation"?

*Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023).

### A.     Count One violates the Second Amendment to the United States Constitution.

*1. Mr. Harris' conduct falls within the Second Amendment's protection.*

Mr. Harris' alleged conduct, possessing an unregistered silencer, qualifies as "keep[ing]" and "bear[ing]" arms under the plain text of the Second Amendment. *See Heller,* 128 S.Ct. at 2791 (defining "arms" to include "weapons of offence, or armour of defence" or "anything that a man wears for his defence, or armour of defence," or "anything that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."). The *Heller* Court further recognized that to "bear arms" is to "wear, bear, or carry …for the purpose …of being armed and ready for offensive or defensive or defensive action in case of conflict with another person." *Id.* at 2793.

"[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." *Bruen* S.Ct. at 2132 *citing Caetano v. Massachusetts,* 136 S.Ct. 1027 (Second Amendment covers stun guns). Although silencers or suppressors are relatively modern inventions, they are "arms" within the meaning of the Second Amendment. Silencers are weapons used to "cast or strike another" as projectiles pass through their chambers and towards the intended target. They may also be considered a form of armor, and they facilitate more effective armed self-defense in various situations. The most obvious way they facilitate self-defense is that they protect their users against

the disorientation caused by a deafening shot during the heat of an attack. Silencers are even included within the term "firearm" under 26 U.S.C. § 5845(a)(7), which assimilates the definition of "silencer" as used in 18 U.S.C. § 921. Section 921 also categorizes silencers as "firearms" and further defines them as:

> The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

18 U.S.C. § 921(25).

Thus, Mr. Harris' conduct in allegedly possessing a silencer, is covered by the plain text of the Second Amendment.

   2. *The challenged statutes violate Mr. Harris' Second Amendment rights.*

26 U.S.C. § 5861(d) prohibits a person's receipt or possession of certain firearms, including silencers, "not registered to him in the National Firearms Registration and Transfer Record." Conditioning lawful possession upon registration hinders Mr. Harris' ability to exercise the right to possess and bear arms guaranteed by the Second Amendment. Because 26 U.S.C. § 5861(d) criminalizes firearm possession, which includes silencers, this Court must determine whether the regulation's burden comports with the nation's firearm history and tradition. According to *Bruen,* this analysis is based on the Supreme Court's definition of historical tradition at the time of the founding and ratification of the Second Amendment in 1791.

Not all eras in history are to be treated equally in this analysis. According to *Bruen,* "[h]istorical evidence that long predates [the ratification] may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." 142 S.Ct. at 2136. *Bruen* distinguished between two types of historical regulations: those addressing persistent societal problems and those addressing novel, modern problems. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be

relatively straightforward." *Bruen,* 142 S.Ct. at 2131. Reviewing courts should decide whether "a distinctly similar historical regulation address[ed] the problem." *Id.* If earlier generations did not prohibit the conduct, or if it was regulated "through materially different means," the present prohibition likely violates the Second Amendment. *Id.* On the other hand, if a prohibition implicates "unprecedented societal concerns," "dramatic technological changes," or regulations "unimaginable at the founding," the "historical inquiry …will often involve reasoning by analogy." *Id.* at 2132. Courts may then ask whether historical prohibitions are "relevantly similar," focusing special attention on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33.

In this case, the government will be unable to proffer evidence showing a national firearm history and tradition from the time of the founding that supports Mr. Harris' prosecution for an unregistered firearm. The National Firearms Act, passed in 1934, "required all importers, manufacturers, dealers, and possessors to register these …guns and gun accessories with the Secretary of the Treasury." Dylan J. McDonough, *Locked, Loaded, and Registered: The Feasibility and Constitutionality of a Federal Firearms Registration System*, 96 Notre Dame L. Rev. 1347, 1352 (2021). The National Firearms Act was the first documented, federally mandated firearm registration requirement that remains in effect today. *Id.* Notably, the NFA emerged nearly 150 years after the passage of the Second Amendment. The government will be unable to establish that the requisite founding era evinced a pervasive tradition of requiring registration of firearms or the resulting felony conviction for possessing an unregistered firearm.

Registration requirements and criminal sanctions for the possession of unregistered firearms is undoubtedly a twentieth century idea. That the founding generation failed to impose registration requirements or provide criminal sanctions for non-compliance is a strong indication that there is no founding era tradition of criminalizing Mr. Harris' possession of an unregistered silencer. *See, e.g.,*

*Bruen,* 142 S.Ct. at 2131 (reasoning that if earlier generations did not prohibit the conduct, or if it was regulated "through materially different means," then the present prohibition likely violates the Second Amendment).

   3. *Dangerous and unusual weapons*

Section 5861 does not involve the registration of all firearms, but only firearms as defined under 26 U.S.C. § 5845. Silencers are included in this definition. *See* § 5845(a)(7). Section 5845 purports to list weapons considered to be unusually dangerous or that are not typically used for home defense purposes. For example, courts have held that machineguns – under paragraph (b) – are not protected by the Second Amendment because they are not currently in common use for self-defense. *United States v. Berger,* 2024 WL 449247 (E.D. Penn. 2024) (and cases cited therein). However, the plain text of the Second Amendment does not limit "arms" to those that are in common use, or to those that are not dangerous and unusual. In the late 18th century, the term "arms" included "all firearms," as well as "instruments of offence generally made use of in war," as well as "weapons that were not specifically designed for military use and were not employed in a military capacity." *Heller,* 128 S.Ct. at 2795. The alleged silencer in this case is described in 26 U.S.C. § 5845(a), but it is hardly in the same class as other weapons listed under this section, such as machineguns, bombs, or hand grenades. *See Capen v. Campbell,* 2023 WL 3767328 at *8 (D. Mass. 2023) ("[H]andguns, rifles, and shotguns are the general types of firearms that are in common use by ordinary citizens for lawful purposes. Machineguns are not. Nor, for that matter, are mortars, rocket launchers, or shoulder-fired missile systems."). Unlike machineguns, hand grenades, or rocket launchers, silencers can easily – and reasonably – be used as a defensive weapon in one's home. They facilitate home defense by protecting their possessors from the dangers of the disorientation caused from a loud shot in close quarters, or elsewhere, when an intruder attack is imminent. Handguns are indisputably covered by the Second Amendment, and they are no more dangerous

than silencers. The "dangerous and unusual" analysis is neither required by the Second Amendment, nor is it consistent with the current "originalist" Constitutional interpretation favored by the current United States Supreme Court.

4. *The government's burden*

The government, applying *Bruen,* carries the burden to demonstrate that this prosecution satisfies the history and tradition scrutiny test. 142 S.Ct. at 2127 ("the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."). Additionally, the government must demonstrate that the firearm restriction at issue here is well-defined and reasonable. *See Bruen,* 142 S.Ct. at 2156. The challenged statute(s) in Count One of this case criminalizes possession of certain "arms" regardless of purpose, including self-defense in the home, merely because the weapon has not been appropriately registered to the possessor. It does not have a tax stamp. Such restrictions have not been a well-defined part of the American tradition and are unreasonable.

**B.      Count Two violates the Second Amendment to the United States Constitution.**

Since *Bruen*, multiple courts have applied its analysis to federal felon-in-possession statutes, and the landscape continues to evolve. Mr. Harris is aware of district court decisions that concluded federal felon-in-possession statutes do not violate the Second Amendment. *See United States v. Bullock*, 2023 WL 4232309 at *1, *14-*27 (S.D. Miss. June 28, 2023) (summarizing rulings of dozens of cases cited by government). As of today's date, Mr. Harris is unaware of any decision <u>binding on this Court</u> that has upheld the federal felon-in-possession statutes post-*Bruen*. Moreover, defendant is aware of recent holding(s) within the Tenth Circuit, which reason that *Bruen* did not invalidate this circuit's precedent on the constitutionality of banning persons with felony convictions in *United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009). *See also Vincent v. Garland*, 80 F.4th 1197 (10th Cir. 2023). Likewise, Mr. Harris is aware of rulings in the Eastern District of Oklahoma that follow this

precedent. *See United States v. Triplett-Armstrong*, Case No. 22-CR-91-RAW and *United States v. Carloss, Case No. 23-CR-86-JFH*.

Defendant Harris respectfully asks this Court to consider the constitutionality of § 922(g)(1) as it applies to him. Several federal courts have held that the Second Amendment invalidates aspects of 18 U.S.C. § 922(g), and the landscape continues to develop. *See, e.g., Range v. Attorney General United States of America*, 69 F.4th 96 (3d Cir. 2023) (en banc) (§ 922(g)(1) unconstitutional as to the plaintiff); *United States v. Rahimi*, 61 F.4th 443, 461 (5th Cir. 2023), *cert. granted* 2023 WL 4278450 (June 30, 2023) (§ 922(g)(8) unconstitutional pursuant to *Bruen* analysis); *United States v. Harrison*, 654 F.Supp.3d 1191, (W.D. Okla. 2023) (§ 922(g)(3) unconstitutional pursuant to *Bruen* analysis)[1]; *United States v. Neal*, 2023 WL 833607 (N.D. Illinois February 7, 2024) (government failed to carry its burden to show a distinctly similar historical regulation and § 922(g)(1) facially unconstitutional under the *Bruen* test).

1. *The District Court decisions dismissing § 922(g)(1) indictment*

The district court in *Bullock* said that, pursuant to *Bruen*, the defendant's motion to dismiss the indictment pursuant to § 922(g)(1) presented the question of whether the government had "demonstrated that, as to Mr. Bullock, the federal felon-in-possession ban is consistent with America's 'historical tradition of firearm regulation.'" *Bullock*, 2023 WL 4232309 *1. The *Bullock* court gave an in-depth analysis of *Bruen* and came to the conclusion that the defendant's indictment should be dismissed. The essence of the *Bullock* decision was that the government had not identified a well-established and representative historical analogue from the eras when the Second and Fourteenth Amendments had been ratified (1791 and 1868, respectively) that would support categorical disarmament of Americans. *Id.* at *2. Therefore, the defendant's motion to dismiss was

---

[1] In the Northern District of Oklahoma, Judge Frizzell has upheld the constitutionality of § 922(g)(1) post-*Bruen*. *See United States v. Mayfield*, 660 F.Supp.3d 1135 (N.D. Okla. 2023).

granted. *Id.* In *United States v. Neal*, the Court echoed a similar analysis in finding § 922(g)(1) facially unconstitutional because the government failed to carry its burden to show a distinctly similar historical regulation as required under the *Bruen* test. 2023 WL 833607 (N.D. Illinois February 7, 2024).

While neither *Bullock* nor *Neal* are binding on this Court, Mr. Harris respectfully requests that this Court follow their well-reasoned analysis and application of *Bruen*, which is binding on this Court.

2.  *Bruen's application to the Indictment in Mr. Harris' case*

*Bruen* is binding upon this Court, and the new standard it articulated must be applied to Mr. Harris' case. It is not sufficient for the government to "simply posit that the regulation promotes an important interest." *Id. See also Range*, 69 F.4th at 106 (government "did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming" the defendant, and therefore summary judgment on constitutionality of § 922(g)(1) was reversed).

In Mr. Harris' case, the government now has the burden of establishing the required American history and tradition of firearms regulation from the era of 1791 that supports disarming Mr. Harris. Once the government has made its own filing in response to this Motion in its attempt to carry its burden, Mr. Harris reserves the right to file a reply brief in order to address the arguments and/or evidence that the government may put forward. Ultimately, Mr. Harris argues that the government cannot be successful in carrying its burden, and therefore he asks this Court to grant this Motion and dismiss the Indictment.

## **CONCLUSION**

Defendant Jeremy Harris respectfully requests the Court dismiss the Indictment for the reasons stated herein.

Respectfully submitted,

OFFICE OF THE FEDERAL PUBLIC DEFENDER
Scott A. Graham, Federal Public Defender

By: /s/ *Richard Koller*
Richard Koller, OBA No. No.22877
112 North Seventh Street
Muskogee, Oklahoma 74401
(918) 687-2430
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of Notice of Electronic Filing to the following ECF registrant(s):

Jessica Bove - Assistant United States Attorney

/s Richard Koller